U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

**2017 AUG 11   AM 11: 49**

BY_____
DEPUTY CLERK

)
WEI WANG, GUANGYI XIONG, AND )
XIAOFENG FENG )
)
        *Plaintiffs*, )
)
   v. )
)
SHEN JIANMING AND )   Civil Action No. 2:17-cv-153
SHENLAW LLC )
)
        *Defendants*. )

## COMPLAINT

Plaintiffs, Wei Wang, Guangyi Xiong, and Xiaofeng Feng (collectively referred to herein as "Plaintiffs"), by and through their attorneys, Barr Law Group, as and for the Complaint against Defendants, Shen Jianming and ShenLaw LLC (collectively referred to as "Defendants" or "Shen"), hereby allege and aver as follows:

## PARTIES

1.  Plaintiffs are individuals who invested in Phase VII of the Jay Peak projects that are described in more detail below.

2.  Plaintiffs are individuals who sought to invest and reside in the United States. Each Plaintiff now resides in China.

3.  Upon information and belief, Defendant, Shen Jianming, is a resident of Roslyn Heights, in the State of New York, and is the managing partner and president of ShenLaw LLC.

4.  Upon information and belief, Defendant, ShenLaw, LLC, is a New York, LLC, with its principal place of business at 1441 Broadway, Suite 3026, and, at the time of the allegations herein, 142 North Court, Roslyn Heights, NY 11577.

## JURISDICTION AND VENUE



**BARR LAW GROUP**

Vermont
—
125 Mountain Road
Stowe, VT 05672

+1 802 253 6272 (t)
+1 802 253 6055 (f)

New York
—
100 Park Avenue
Suite 1600
New York, NY 10017

+1 212 486 3910 (t)
+1 212 486 7688 (f)

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

6. Venue is proper pursuant to 28 U.S.C § 1391(b)(2).

7. Joinder of the Plaintiffs is proper pursuant to Fed.R.Civ.P. Rule 20(1)(a)(1).

## FACTUAL ALLEGATIONS

8. At all relevant times, Shen was engaged in the professional trade and business of providing legal services.

9. At all relevant times, the Defendant Shen was actively involved in the management, business decisions, and marketing of ShenLaw LLC.

10. In substantial part, Shen's business is aimed at handling transactions for immigrant investors through the federal EB-5 Immigrant Investor Program.

11. At all relevant times, the individual Defendants derived substantial income and financial gain from fees collected from the Plaintiffs and to countless immigrant investors.

12. The EB-5 Immigrant Investor Program was created to stimulate the U.S. economy with capital investment from foreign investors. Under the program, foreign investors can receive a permanent visa to live and work in the U.S. if they make a capital investment that satisfies certain conditions over a two-year period, including the creation of jobs. The EB-5 investments are typically administered by "regional centers" throughout the U.S. and made in limited partnerships managed by people other than the foreign investors.

13. Under the EB-5 Immigrant Investor Program, foreign investors who invest capital in such a "commercial enterprise" in the United States may petition the USCIS and receive conditional permanent residency status for a two-year period (such a petition is called an

"I-526 Petition"). The USCIS defines a "commercial enterprise" as any for-profit activity formed for the ongoing conduct of lawful business.

14. In general terms, the EB-5 program allows foreign investors, along with their spouse and children under age twenty-one (21), to become eligible for a green card if they make the required investment in a commercial enterprise in the U.S. and plan to create or preserve at least ten (10) permanent full-time jobs for qualified U.S. workers.

15. While the EB-5 program is, on one hand, an immigration program, it is fundamentally an investment program, involving the marketing and sale of an investment interest.

16. The EB-5 Immigrant Investor Program requires a showing that the foreign investor "has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk."

17. If the foreign investor satisfies these and other conditions within the two-year period, the foreign investor may apply to have the conditions removed from his or her visa to live and work in the United States permanently.

18. Using the EB-5 program, the promoters create a pathway for a foreign national to gain permanent residency here in the United States. They also provide a pathway for the flow of billions of dollars in investor funds within the United States. Included with this massive amount of investment flow is the potential for lucrative consultancy opportunities, brokerage opportunities, a micro-economy of administrative and transactional business opportunities, and thinly-guised kick-backs -- commissions, referral fees, and the like -- for those who direct investment towards a particular promoter's project.

19. Defendants hold themselves out to be experienced EB-5 attorneys with a nationwide presence.

20. In addition to marketing Shen's experience in EB-5 generally, Shen was engaged in marketing, promoting, and directing potential investors towards a particular EB-5 project - the Jay Peak EB-5 program.

21. In 2006, Jay Peak, captained by William Stenger and Ariel Quiros, partnered with the state run regional center (the Vermont Regional Center, hereafter "VRC") to pursue a multi-million dollar EB-5 project to develop Jay Peak, Burke, and the greater Newport area (the "Jay Peak Projects"). The Jay Peak Projects include each of the following entities:

    a. Jay Peak Hotel Suites L.P. ("Phase I"), a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2006 and May 2008, Phase I raised $17.5 million from thirty-five (35) investors through an EB-5 offering of limited partnerships to build a hotel.

    b. Jay Peak Hotel Suites Phase II L.P. ("Phase II"), a Vermont limited partnership with its principal place of business in Jay, Vermont. Between March 2008 and January 2011, Phase II raised $75 million from 150 investors through an EB-5 offering of limited partnership interests to build a hotel, an indoor water park, an ice rink, and a golf club house.

    c. Jay Peak Penthouse Suites L.P. ("Phase III"), a Vermont limited partnership with its principal place of business in Jay, Vermont. Between July 2010 and October 2012, Phase III raised $32.5 million from sixty-five (65) investors through an EB-

4

5 offering of limited partnership interests to build a fifty-five (55) unit "penthouse suites" and an activities center, including a bar and restaurant.

d. Jay Peak Golf and Mountain Suites L.P. ("Phase IV"), a Vermont limited partnership with its principal place of business in Jay, Vermont. Between December 2010 and November 2011, Phase IV raised $45 million from ninety (90) investors through an EB-5 offering of limited partnership interests to build "golf cottage" duplexes, a wedding chapel, and other facilities.

e. Jay Peak Lodge and Townhouses L.P. ("Phase V"), a Vermont limited partnership with its principal place of business in Jay, Vermont. Between May 2011 and November 2012, Phase V raised $45 million from ninety (90) investors through an EB-5 offering of limited partnership interests to build thirty (30) vacation rental townhouses, ninety (90) vacation rental cottages, a café, and a parking garage.

f. Jay Peak Hotel Suites Stateside L.P. ("Phase VI"), a Vermont limited partnership with its principal place of business in Jay, Vermont. Between October 2011 and December 2012, Phase VI raised $67 million from 134 investors through an EB-5 offering of limited partnership interests to build an eighty-four (84) unit hotel, eighty-four (84) vacation rental cottages, a guest recreation center, and a medical center.

g. Jay Peak Biomedical Research Park L.P. ("Phase VII"), a Vermont limited partnership with its principal place of business in Newport, Vermont. Since November 2012, Phase VII has raised approximately $83 million from 166 investors through an EB-5 offering of limited partnership interests to construct a

biomedical research facility.  Defendants seek to raise an additional $27 million from 54 investors.

    h.   QBurke Mountain Resort, Hotel and Conference Center L.P. ("Phase VIII"), a Vermont limited partnership with its principal place of business in East Burke, Vermont.  Phase VIII consists of 121 investors who invested in an EB-5 offering of limited partnership interests to construct a hotel, conference center, an aquatic center, a tennis center, and a mountain bike facility.

22. On multiple occasions, Shen authored, procured, and disseminated direct advertisements to foreign investors.  In those direct advertisements, Shen endorsed the Jay Peak Projects as being one of the best EB-5 enterprises in the United States, as having a 100% I-526 Petition approval rate, and as presenting one of the best investment (as to principal return) opportunities in the EB-5 realm.

23. These advertisements were specifically directed to investors in China, including the Plaintiffs.

24. An I-526 Petition requires a representing lawyer to acquire and supply evidence that the chosen EB-5 investment project will create ten (10) full-time positions for qualifying employees.  This ten (10) job mandate requires that immigrant investor money is appropriately spent by the EB-5 project to create the requisite jobs.

25. Relying upon Shen's representations of EB-5 expertise, each of the Plaintiffs retained Shen to represent them in their investment transaction in the United States.

26. Plaintiff Feng retained Shen (in a signed retainer agreement) in December of 2013.

27. Plaintiff Wang retained Shen (in a signed retainer agreement) in May of 2014.

28. Plaintiff Xiong retained Shen (in a signed retainer agreement) in March of 2016.

29. At the time of the retainer agreements, Shen presented the Plaintiffs with wiring instructions and written materials directing them to the Jay Peak Projects. In particular, Shen directed the Plaintiffs to the Phase VII Biomedical Research Park.

30. Shen informed the Plaintiffs that these Jay Peak investments were the best in the United States.

31. Shen informed the Plaintiffs that he would represent the Plaintiffs if they invested in the Jay Peak Projects, and Shen only introduced the Plaintiffs to the Jay Peak Projects.

32. Shen directed over seventy (70) clients to the Phase VII investment.

33. Relying upon Shen's recommendations, each Plaintiff pursued an investment in Phase VII.

34. Each of the Plaintiffs was then presented with traditional investment offering documents for the Phase VII project.

35. The organizers of the Phase VII project and the investments' regional center were headquartered in the United States, and they operated solely in this Judicial District.

36. The offerings required the Plaintiffs to invest a capital contribution of $500,000 and to pay a separate administrative or management fee of $50,000.00, which was used to pay other fees and expenses incurred by the promoters, including the payment of commissions and finder's fees.

37. The promoters of the Phase VII investment pooled the foreign investor's capital contributions to fund the Phase VII project.

38. The Plaintiffs expected a return on their investment, not only because of the offering documents and statements of its promoters, but based upon the assurances of Shen.

7

39. The investments by the Plaintiffs were passive investments, as they relied on others to develop job-creating projects.

40. The Plaintiffs were not involved in the making or servicing of their investments in Phase VII, nor were they involved in the operation and/or management of the project itself; rather, the Plaintiffs relied on Phase VII's promoters for the success of the projects and obtaining a return on their investments.

41. The operating agreement for Phase VII vested management control in the hands of its promoters; thus, the Plaintiffs were dependent on the efforts of others to realize their profits.

42. Shen circulated the private placement memoranda and other offering documents to the Plaintiffs for the Phase VII investments that were recommended.

43. These offering documents described the terms of the investment and how the profits would be allocated to the investors.

44. Upon information and belief, Shen received money directly from Jay Peak for directing clients to the various Jay Peak projects.

45. Upon information and belief, Shen received benefits from Jay Peak in exchange for directing clients to the various Jay Peak projects.

46. Shen was offered money from Phase VII's agents and/or partners for referring clients to the various Jay Peak Projects.

47. Based on the advice and recommendations of Shen, Plaintiff Feng signed on to the Phase VII project in December of 2013; and, thereafter, transferred $550,000.00 to Phase VII's promoters.

48. Based on the advice and recommendations of Shen, Plaintiff Wang signed on to the Phase VII project in July of 2014; and, thereafter, transferred $550,000.00 to Phase VII's promoters.

49. Based on the advice and recommendations of Shen, Plaintiff Xiong signed on to the Phase VII project in March of 2016; and, thereafter, transferred $550,000.00 to Phase VII's promoters.

50. Unfortunately, and unbeknownst to any of the Plaintiffs, Phase VII (and, in fact, the phases that preceded it) were complete and total frauds.

51. Shen explicitly assured the Plaintiffs that he would assist with the necessary due diligence and immigration suitability of the Jay Peak Projects, along with advice about projects and regional centers of which to be wary.

52. Shen did not complete any basic due diligence with regard to Plaintiffs' investments.

53. Shen did not complete any due diligence, despite representing over a hundred (100) investors in the various Jay Peak Projects (*i.e.* Phases I-VIII)

54. At all relevant times, Defendant Shen was and is not licensed to practice law in Vermont.

55. The most basic and standard legal due diligence would have revealed that the Plaintiffs were throwing their money into a complete sham.

56. In fact, basic due diligence would have confirmed that the first wave of investor- funds (Phase I) were illegally misappropriated when they were used to fund the purchase of the Jay Peak resort.

57. Public allegations of wrongdoing began as early as 2012, when Douglas Hulme of Rapid USA Visas (an immigrant advisor for Jay Peak) issued formal, written, and detailed

complaints, raising concerns that the Jay Peak Projects were misappropriating funds in violation of state and federal laws.

58. Specifically, Douglas Hulme's attorney asked for balance sheets, banks statements and wire transfers, as well as the source-and-use of funds reports for the Jay Peak Projects, all with the aim to provide written assurances that the Jay Peak Projects were in compliance with federal and state law.

59. Hulme shared his concerns in an email to approximately a hundred lawyers in the EB-5 investment world.

60. Thereafter, in May of 2014, a group of twenty (20) Jay Peak investors began flooding Jay Peak with complaints about the Jay Peak Projects' misappropriation of investor funds.

61. Specifically, the Jay Peak investors' complaints focused on concerns regarding: (i) a double (fraudulent) sale of the "Penthouse Suites" EB-5 project at Jay Peak (the "Penthouse Suites"); (ii) the unilateral conversion of equity interests into a dubious, unsecured promissory note (the "Unsecured Promissory Note") by William Stenger, which occurred in August 2013 without notification to Jay Peak investors; and (iii) investors' inability to acquire the Jay Peak Projects' financials showing the source-and-use of Jay Peak investor funds.

62. The double (fraudulent) sale of the Penthouse Suites was originally billed as an EB-5 investor raise to construct fifty-five (55) deluxe suites – complete with an expansive living room, either one (1) or two (2) master bedrooms, a deluxe kitchen, and a balcony – atop the five-story Hotel Jay[1] (Phase II of the Jay Peak Projects).  In total, the Penthouse Suites were to cover an area of approximately 46,000 sq. ft. with a total project cost of

---

[1] Land Use Permit #7R0854-10 shows that the Hotel Jay was to be a five-story, approximately 250,000 sq. ft. hotel, consisting of 120 guest units.

$37,500,000.00 ($32,500,000.00 of which was derived from Jay Peak investor funds), and a construction schedule commencing in January 2011 and ending by late 2011/early 2012. The Hotel Jay and Penthouse Suites construction was to total approximately 296,000 sq. ft. consisting of 175 suites, fifty-five (55) of which were Penthouse Suites.

63. However, after comparing their I-829 Petitions with Land Use Permit #7R0854-10-A[2] (which was omitted from their I-829 Petitions) and Jay Zoning Board meeting minutes from August 9, 2010, it was discovered that the combined construction of the Hotel Jay and Penthouse Suites projects amounted to a mere 258,300 sq. ft. with a total of 130 suites.

64. Thus, approximately 40,000 sq. ft. and 45 suites of the Penthouse Suites were never built and the vast majority of monies invested by the Jay Peak investors in the Penthouse Suites were left unaccounted. The Penthouse Suites were largely a fraudulent offering, as was made clear by documents that were readily available upon request, inspection, and analysis.

65. With regard to the Unsecured Promissory Note, William Stenger waited until January 2014 to inform the Jay Peak investors of its existence and further waited to disclose the actual document until April 2014.

66. In addition to converting the Jay Peak investors' equity interests into the Unsecured Promissory Note, William Stenger unilaterally dissolved the limited partnership.

67. Basic inquiry by Shen – who had unparalleled ties to the Jay Peak projects by sheer volume of clients in the projects – would have revealed the perpetual scam of each new

---

[2] Land Use Permit #7R0854-10-A was an amendment to Land Use Permit #7R0854-10 where it permitted the additional construction of approximately 8,300 sq. ft. consisting of only ten (10) guest suites on the fifth floor of the Hotel Jay.

investment raise being used to pay for the scam project that proceeded it (along with the misappropriation and illicit payments to those involved).

68. In fact, Jay Peak did not provide Shen with any financial information on how EB-5 investor money was spent and, indeed, Attorney Shen never requested any.

69. Shen conducted no meaningful or basic due diligence in regard to each of his clients' one-half million dollar investment in a security.

70. From 2013 to 2016, Attorney Shen flew first class around the world using the substantial fees that he had collected from his clients. Had Attorney Shen simply used this money and these travels to investigate Phase VII's parent company (AncBio in South Korea), Shen would have discovered that AncBio was sold at auction in May of 2014 to satisfy its creditors.

71. Had Shen done the required due diligence for his clients, Shen would have also learned that Phase VII had done absolutely nothing to obtain approval from the U.S. Food and Drug Administration for the Phase VII research center's products – a base level pre-requisite for the operation of Phase VII and the use of the Plaintiffs' investment funds.

72. Had Shen performed basic due diligence, Shen would have advised his clients as to what was confirmed in April of 2016 when the United States Securities and Exchange Commission filed a securities fraud lawsuit against the Jay Peak developers and promoters for complete misappropriation of EB-5 investor funds.

73. Upon information and belief, Shen failed to inform clients, including Plaintiffs, of the wrongdoing at Jay Peak because Shen was receiving direct financial compensation, indirect compensation, and/or benefits from Jay Peak that created an impermissible conflict of interest.

74. Because of Attorney Shen's wrongdoing, deceit, omissions, and failure to follow through on his attorney obligations, along with his overall disloyalty, the Plaintiffs never received the proper documentation verifying how EB-5 investors' funds were being used at Jay Peak.

75. But for Shen's wrongdoing, deceit, omissions, and failure to follow through on his attorney obligations, Plaintiffs would not have subscribed to Jay Peak as Phase VII investors.

76. Because of Shen's wrongdoing, deceit, omissions and failures to follow through on his attorney obligations, Defendants wrongfully benefitted themselves at Plaintiff's expense, and wrongfully retained client funds that had not been earned.

77. Because of Shen's wrongdoing, deceit, omissions, and failures to follow through on his attorney obligations, the Plaintiffs have lost their investment, their administrative fees, and the fees paid to Shen.

78. Due to the inaction/actions of Shen and the total fraud of Phase VII, the Plaintiffs and their families reside in Beijing, China.

## CAUSES OF ACTION

### COUNT I

#### *Malpractice (Against All Defendants)*

79. Plaintiffs re-allege and incorporate herein by reference the allegations of this complaint throughout.

80. At all relevant times, the Defendants owed Plaintiffs a duty of care arising from the attorney-client relationship.

81. By the Defendants' representations, Defendants owed Plaintiffs a duty of care to exercise professional skill commensurate with Defendants' expertise and superior legal skill, knowledge, and ethical standards.

82. In the course of the representation of Plaintiffs, Defendants breached their duties to Plaintiffs by failing to exercise reasonable care and skill in handling Plaintiffs' case.

83. In the course of the representation of Plaintiffs, Defendants breached their duty to Plaintiffs by failing to exercise the care and skill expected of specialized attorneys (as represented by Defendants).

84. In the course of the representation of Plaintiffs, Defendants breached their duty to Plaintiffs by intentionally and continually failing to abide by Plaintiffs' lawful instructions and requests, and by taking actions contrary to Plaintiffs' interests.

85. In the course of the representation of Plaintiffs, Defendants breached the duty of care owed to Plaintiffs by actively committing and condoning multiple violations of the Vermont Rules of Professional Conduct, most notably practicing law in Vermont without a license.

86. As a proximate cause of Defendants' breaches and wrongdoing, Plaintiffs suffered and continue to suffer harm and damages, including special damages as to their reputations in an amount to be determined at trial.

## COUNT II

### *Breach of Contract (Against All Defendants)*

87. Plaintiffs incorporate the allegations throughout this Complaint as if fully set forth hereunder.

88. In their representation of Plaintiffs, Defendants agreed to bill Plaintiffs and retain payment for legal services performed on Plaintiffs' behalf.

89. In their representation of Plaintiffs, Defendants billed Plaintiffs and retained payments from Plaintiffs for legal services that were not performed and for services that were falsely represented to have been performed.

90. For good and valuable consideration, Defendants agreed to provide legal services on Plaintiffs' behalf for Plaintiffs' benefit in the I-526 Petition and its associated due diligence.

91. Defendants breached the contract with Plaintiffs by failing to provide legal services that were contracted for and by falsely representing those services.

92. As a consequence of Defendants' breach, Plaintiffs suffered and continue to suffer harm and damages in an amount to be determined at trial.

## COUNT III

### *Breach of Good Faith and Fair Dealing (Against All Defendants)*

93. Plaintiffs incorporate the allegations throughout this Complaint as if fully set forth hereunder.

94. At all relevant times, the parties were bound to execute their agreement for representation and legal services consistent with the covenant of good faith and fair dealing.

95. Plaintiffs expended money and resources to both pay and assist Defendants in their representation according to the requests of Defendants and the necessity of preparing Plaintiffs' I-526 Petitions and the associated due diligence.

96. Plaintiffs reasonably expected that the money and expenditure of time and resources were being used by Defendants to prepare Plaintiffs' I-526 Petitions and the associated due diligence.

97. In fact, Plaintiffs' money, time, and resources were not being used for the preparation of Plaintiffs' I-526 Petitions and the associated due diligence, and worse, Plaintiffs' money, time, and resources were being funneled to a sham representation filled with false efforts, false information, and the fraudulent appearance of responsive representation.

98. As a consequence of Defendants' wrongful acts and conduct, Plaintiffs have suffered and continue to suffer harm and damages, and Defendants have been and continue to be unjustly enriched.

## COUNT IV

### *Quantum Meruit/Unjust Enrichment (Against All Defendants)*

99. Plaintiffs incorporate the allegations throughout this Complaint as if fully set forth hereunder.

100. Defendants billed Plaintiffs for legal services that were not performed.

101. Defendant accepted and retained consideration for legal services that were not performed.

102. As a consequence of Defendants' wrongful acts and conduct, Plaintiffs have suffered and continue to suffer harm and damages, and Defendants have been and continue to be unjustly enriched.

## COUNT V

### *Violation of Section 10(b) and Rule 10b-5 (Against All Defendants)*

103. Plaintiffs incorporate the allegations throughout this Complaint as if fully set forth hereunder.

104. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

105. The EB-5 investments are securities under the meaning of Exchange Act.

106. Shen is not a registered broker of securities.

107. The Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading to Plaintiffs. The purpose and effect of this scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiffs to subscribe and invest in the Jay Peak projects.

108. The Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly, and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiffs as particularized above.

109. When they made false statements and committed their omissions, the Defendants knew facts or had access to information suggesting that their public statements were not accurate or recklessly failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.

110. The Defendants were motivated to commit wrongful acts by the receipt of lucrative fees from investors who became legal clients, as well as monetary compensation and benefits conferred upon Shen by the Jay Peak entities.

111. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiffs relied, to their detriment, on such misleading statements and omissions in purchasing limited partnership interests in the Jay Peak Projects. Plaintiffs have suffered substantial damages as a result of the wrongs alleged herein.

112. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.  employed devices, schemes, or artifices to defraud;

    b.  made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.  engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

113. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

114. By reason of the foregoing, the Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices,

schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their investments in the Jay Peak Projects.

115. As a result, Plaintiffs suffered and continue to suffer harm and damages.

### COUNT VI

*Consumer Fraud – Unfair and Deceptive Acts & Violation of the Consumer Fraud Act – 9 V.S.A. §§ 2451, et al. (Against All Defendants)*

116. Plaintiffs incorporate the allegations throughout this Complaint as if fully set forth hereunder.

117. Defendants made misrepresentations, concealed information, and engaged in unfair practices that were likely to mislead and, in fact, did mislead Plaintiffs with regard to the services of state oversight, administration, management, and overall regulation of the Jay Peak Projects.

118. Specifically, in order to induce Plaintiffs to avail themselves of the Jay Peak Projects and to induce representation in exchange for fees, Defendants represented that the Phase VII projects was one of the best in United States and that Shen would represent their investment interests.

119. Plaintiffs reasonably interpreted the Defendants' misrepresentations in this regard, and paid fees and made their investment to the benefit of Shen and to their own detriment.

120. The misleading effect of Defendants' misrepresentations, willful omissions, or fraudulent practices were material because they affected Plaintiffs' decision to select

Shen and Jay Peak Projects as a sound investment in reliance upon there representations of Shen.

121. The Defendants' misrepresentations, willful omissions, or fraudulent practices were made with wanton disregard for the rights of Plaintiffs.

122. As a result, Plaintiffs suffered and continue to suffer harm and damages.

**COUNT VII**

***Breach of Fiduciary Duty (Against all Defendants)***

123. Plaintiffs incorporate the allegations throughout this Complaint as if fully set forth hereunder.

124. As Plaintiffs' attorneys, Defendants acted in a fiduciary capacity in relation to Plaintiffs and their interests.

125. In their legal representation of Plaintiffs, Defendants were required to execute their fiduciary duties by acting in good faith and with loyalty for the advancement of Plaintiffs' interests, and with the care of an ordinarily prudent person in a like position would exercise under similar circumstances.

126. Defendants had a duty to avoid conflicts of interest that may have impaired Defendants' ability to exercise independent professional judgment on behalf of the Plaintiffs.

127. Defendants had a corresponding duty to disclose potential conflicts to Plaintiffs, and to obtain informed consent for continuation of the representation in light of those potential conflicts.

128. Defendants had a corresponding duty to represent the Plaintiffs without allowing potential conflicts to impair or affect Defendants' prudent judgment and proper representation of Plaintiffs.

129. Defendants breached their fiduciary duties because they failed to act in good faith, failed to act with loyalty in the advancement of Plaintiffs' interests, and failed to act with the care of an ordinarily prudent person in a like position would exercise under similar circumstances by funneling Plaintiffs' money, time, and resources into a sham representation filled with false efforts, false information, and the fraudulent appearance of responsive representation.

130. Defendants breached their fiduciary duties because they failed to act in good faith, failed to act with loyalty in the advancement of Plaintiffs' interests, and failed to act with the care of an ordinarily prudent person in a like position would exercise under similar circumstances by intentionally and continually failing to abide by Plaintiffs' lawful instructions and requests, and by taking actions contrary to Plaintiffs' interests.

131. Defendants breached their fiduciary duties because they failed to avoid conflicts of interest, failed to disclose any and all conflicts of interest, and allowed conflicts of interest to affect their prudent judgment and representation of Plaintiffs.

132. Specifically, Defendants have breached their fiduciary duties by failing to investigate and/or disclose and all material and necessary facts to Plaintiffs prior to Plaintiffs' investments in the Phase VII project.

133. But for Defendants' wrongful acts and conduct, Plaintiffs would not have invested in the Phase VII project.

134. As a consequence of Defendants' wrongful acts and conduct, Plaintiffs have suffered and continue to suffer harm and damages.

WHEREFORE, Plaintiffs respectfully requests the following relief:

1. Compensatory, consequential, and general damages in an amount to be determined at trial;

2. Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

3. Punitive damages for each claim to the maximum extent available under law on account of the outrageous nature of Defendants' willful and wanton disregard for Plaintiffs' rights;

4. Award treble damages under 9 V.S.A. §§ 2453 and 2461 in an amount to be determined at trial;

5. Compensatory, consequential, and general damages under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, in an amount to be determined at trial;

6. Costs and disbursements of the action;

7. Pre- and post-judgment interest;

8. Reasonable attorneys' fees; and

9. Total damages in excess of $2,000,000.00 for each Plaintiff, and such other relief as this Court deems just and proper

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: August 7, 2017
Stowe, Vermont

Respectfully Submitted,

Barr Law Group

By: _____
Russell D. Barr
125 Mountain Road

Stowe, VT 05672
Phone: 802.253.6272
Fax: 802.253.6055

By: _____
Chandler W. Matson
125 Mountain Road
Stowe, VT 05672
Phone: 802.253.6272
Fax: 802.253.6055

*Attorneys for Plaintiffs Wei Wang, Guangyi Xiong, and Xiaofeng Feng*