U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2019 JUL 19 PM 2: 14

CLERK

BY _____
DEPUTY CLERK

WEI WANG, GUANGYI XIONG, )
XIAOFENG FENG, )
)
Plaintiffs, )
)
v. ) Case No. 2:17-cv-00153
)
SHEN JIANMING, SHENLAW LLC, )
DARREN SILVER, and DARREN SILVER )
& ASSOCIATES LLP, )
)
Defendants. )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' THIRD MOTION TO AMEND COMPLAINT AND TO ADD CLASS ACTION CLAIMS AND GRANTING SILVER DEFENDANTS' MOTIONS TO DISMISS
(Docs. 67, 86, & 87)

On August 11, 2017, Plaintiffs Wei Wang, Guangyi Xiong, and Xiaofeng Feng filed a Complaint in this court alleging legal malpractice; breach of contract; breach of the implied covenant of good faith and fair dealing; unjust enrichment; violations of Sections 10(b) and 10b-5 of the Securities Exchange Act of 1934; unfair and deceptive practices in violation of the Vermont Consumer Protection Act, 9 V.S.A. §§ 2451-82j; and breach of fiduciary duty against Jianming Shen[1] and ShenLaw LLC (collectively, the "Shen Defendants"). Plaintiffs' claims arise out of development projects in Jay Peak, Burke, and the greater Newport area of Vermont comprised of eight phases in various stages of completion (the "Jay Peak Projects").

Pending before the court is Plaintiffs' third motion to amend the Complaint and to add class action claims (Doc. 67). Also pending before the court are a motion to dismiss

---

[1] In the caption, this Defendant is referred to as "Shen Jianming," however, both Defendants' briefing and Attorney Shen's affidavit indicate that his name is "Jianming Shen." The court therefore directs the Clerk of Court to correct the caption.

Plaintiffs' claims for lack of personal jurisdiction pursuant to Rule 12(b)(2) (Doc. 86), a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), and a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) (Doc. 87) filed by Defendants Darren Silver and Darren Silver & Associates LLP (the "Silver Defendants").

At issue is whether Plaintiffs should be permitted to amend their Complaint a third time; whether Plaintiffs' proposed class action claims are futile; whether Plaintiffs' motion to amend should be denied on the grounds of undue delay; whether Plaintiffs have standing to assert their proposed class action claims; whether the court has subject matter jurisdiction in light of the absence of diversity of citizenship between proposed new plaintiff Stephen Webster and the Silver Defendants; and whether the court may properly exercise personal jurisdiction over the Silver Defendants.

I. **Procedural Background.**

On June 22, 2018, approximately ten months after filing their initial Complaint, Plaintiffs moved to amend their Complaint to add class action claims. In their First Amended Complaint, Plaintiffs, individually and on behalf of similarly situated class members, alleged four causes of action against a proposed class of defendants: breach of fiduciary duty; unfair and deceptive practices in violation of the Vermont Consumer Protection Act, 9 V.S.A. §§ 2451-82j; legal malpractice; and breach of the implied covenant of good faith and fair dealing. The Shen Defendants opposed the motion to amend.

On August 13, 2018, prior to the court's ruling on their first motion to amend, Plaintiffs filed a second motion to amend their Complaint to add Stephen Webster as a plaintiff and to add the Silver Defendants as defendants. Plaintiffs served their proposed Second Amended Complaint without withdrawing their proposed First Amended Complaint.

At a hearing on November 5, 2018, the court granted Plaintiffs' oral motion to withdraw their first motion to amend the Complaint and granted in part and denied in part Plaintiffs' second motion to amend the Complaint. The court ruled that the class action allegations as pled were futile because the proposed class of plaintiffs lacked standing to

2

sue the proposed class of defendants. At Plaintiffs' request, the court granted Plaintiffs thirty days to file a Third Amended Complaint (hereinafter, "TAC") to correct certain factual errors in their Second Amended Complaint. The court did not foreclose the possibility of revised class action claims. Thereafter, Plaintiffs embarked upon what they characterize as a "vast overhaul of Part II" (Doc. 67 at 2) of their Complaint. They seek to add claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (Count I); conspiracy to violate 18 U.S.C. § 1962(c) (Count II); civil conspiracy to violate 13 V.S.A. § 1108 (Count III); and unjust enrichment (Count IV). They propose asserting these claims on behalf of a class of plaintiffs comprised of "individuals who retained the Defendant Attorneys to perform all necessary legal services for their investment at the Jay [Peak] Projects under and pursuant to the United States Citizenship and Immigration Services Employment-Based, Fifth Preference ('EB-5') immigrant-investor program" (the "Proposed Class Plaintiffs") against a proposed class of defendants comprised of individuals or business entities "hired by a Plaintiff to represent them in their investment with the Jay Peak Projects" (the "Proposed Class Defendants"). (Doc. 67-1 at 31, ¶¶ 16, 21.)

The TAC further seeks to add Siyi Chen as a plaintiff and to add defendants Darren Silver; Darren Silver & Associates LLP;[2] Dai & Associates LLP; Nguyen Huuan; Ting Geng; the Law Offices of Geng & Zhang, PLLC; Leslie I. Snyder, BSC; Ruben Flores; and Cheng Yun & Associates, PLLC. The TAC seeks to remove defendants Schnader, Harrison, Segal & Lewis LLP; the Flores Group; and Yun Cheng.

The Shen Defendants filed an initial opposition on February 1, 2019 and a supplemental opposition on March 13, 2019. Plaintiffs filed a reply on March 15, 2019 and a supplemental reply on March 27, 2019, at which time the court took the pending

---

[2] The redlined version of the TAC indicates that Darren Silver & Associates LLP has been deleted from the case caption. However, this appears to have been inadvertent, as Plaintiffs indicated in their opposition to the Silver Defendants' motions to dismiss that they oppose dismissal of Darren Silver & Associates LLP. *See* Doc. 109 ("Plaintiff . . . hereby opposes and moves this Honorable Court to deny Defendants, Darren Silver and Darren Silver & Associates LLP (the "Silver Defendants"), Motions to Dismiss[.]").

motion under advisement. The Silver Defendants filed motions to dismiss on March 7, 2019 which Plaintiffs opposed on May 31, 2019. The Silver Defendants replied on June 21, 2019, at which time the court took those motions under advisement. In light of the overlap among the pending motions, the court addresses them in a single opinion.

Plaintiffs are represented by Russell D. Barr, Esq. and Chandler W. Matson, Esq. The Shen Defendants are represented by Andrew H. Montroll, Esq. The Silver Defendants are represented by Christopher E.H. Sanetti, Esq.

## II. The TAC's Factual Allegations.

### A. Allegations Against the Shen Defendants Individually.

Plaintiffs are individuals who sought to invest and reside in the United States pursuant to the United States Citizenship and Immigration Services ("USCIS") employment-based fifth preference ("EB-5") visa program. This program authorizes foreign investors who have invested capital in a commercial enterprise in the United States to file an I-526 Petition requesting conditional permanent residency status for a two-year period. An I-526 Petition requires a petitioner to acquire and supply evidence that the chosen EB-5 investment project will create ten full-time positions for qualifying employees. If the foreign investor satisfies certain criteria, he or she may apply to have the conditions removed from his or her visa in order to permanently live and work in the United States.

Jianming Shen is an attorney who is the managing partner and president of ShenLaw LLC which has its principal place of business in New York. ShenLaw LLC handles transactions for immigrant investors through the EB-5 program. Attorney Shen allegedly "holds himself out to be an experienced EB-5 attorney with a nationwide presence." *Id.* at 8, ¶ 24.

Plaintiffs contend that Attorney Shen directed them to invest in the Jay Peak Projects and, on multiple occasions, authored, procured, and disseminated advertisements to foreign investors in which he endorsed the Jay Peak Projects as being one of the best EB-5 enterprises in the United States with a 100% I-526 Petition approval rate. More specifically, Attorney Shen allegedly directed approximately seventy clients, including

4

Plaintiffs, to invest in Phase VII of the Jay Peak Projects, which included the Jay Peak Biomedical Research Park L.P.

Plaintiff Feng retained Attorney Shen in December 2013, although Attorney Shen maintains that Plaintiff Feng did not pay his retainer or bills for legal fees. Plaintiff Wang retained Attorney Shen in May 2014 and paid approximately $18,000 in legal fees and filing costs to the Shen Defendants. Plaintiff Xiong retained Attorney Shen in March 2016 and paid approximately $14,500 in legal fees and filing costs to the Shen Defendants.

After retaining Attorney Shen, Plaintiffs received the investment offering documents for Phase VII. The offerings required each Plaintiff to make a capital contribution of $500,000 and pay a separate administrative or management fee of $50,000 which was used to pay fees and expenses incurred by the promoters, including the payment of commissions and finder's fees. Each Plaintiff complied with these requirements and transferred $550,000 to the Phase VII promoters.

Attorney Shen allegedly "explicitly assured" Plaintiffs that he would assist with the necessary due diligence and ensure the "immigration suitability" of the Jay Peak Projects; however, he allegedly did not conduct any due diligence regarding Plaintiffs' investments. *Id.* at 13, ¶ 56. Plaintiffs assert that "[t]he most basic and standard legal due diligence would have revealed that [Plaintiffs] were throwing their money into a complete sham." *Id.* at 14, ¶ 60. Attorney Shen did not request financial information regarding how EB-5 investor funds were spent, and the Jay Peak Projects did not disclose that information. In 2012, public allegations of wrongdoing by the Jay Peak Projects promoters emerged. By May 2014, a group of twenty investors had complained about the misappropriation of investor funds.

Phase VII's parent company, AncBio, was ultimately sold at auction in May 2014 to satisfy creditors. Phase VII did not obtain approval from the U.S. Food and Drug Administration for the research center's products—a prerequisite for the operation of Phase VII and the use of Plaintiffs' investment funds. Plaintiffs allege that Attorney Shen failed to inform them of wrongdoing at the Jay Peak Projects because he was

5

receiving direct and indirect compensation in exchange for referring foreign investors to the Jay Peak Projects.

As a result of the Shen Defendants' acts and omissions, Plaintiffs allege that they have "lost their initial investment, their initial path to immigration in the United States, their administrative fees, and the fees paid to [Attorney] Shen." *Id.* at 17-18, ¶ 82. Through separate litigation, the federally appointed receiver of the Jay Peak Projects secured a settlement from which each Plaintiff was offered $500,000. Plaintiffs Wang and Feng each accepted the $500,000, while Plaintiff Xiong did not.

## B. Proposed Class Allegations and Claims.

Proposed Class Plaintiffs are over one hundred individuals who invested in the Jay Peak Projects and retained Proposed Class Defendants to perform legal services in support of their EB-5 visa applications. Proposed Class Defendants are approximately seventy-one attorneys or law firms who allegedly marketed and promoted the Jay Peak Projects to potential investors, including Proposed Class Plaintiffs.

Proposed Class Defendants collected legal fees from Proposed Class Plaintiffs of approximately $13,000 to $18,000 per class member. Proposed Class Plaintiffs and Proposed Class Defendants reviewed investment offering documents for the Jay Peak Projects which described how the investors' money was to be used and how the profits would be allocated to the investors.

Proposed Class Plaintiffs were required to invest a capital contribution of $500,000 and pay a separate administrative fee of $50,000 which was "supposed to be used to pay legitimate fees and expenses incurred by the Jay Peak Projects and the promoters of the Projects." *Id.* at 38, ¶ 54. However, these funds were allegedly commingled by the Jay Peak Projects and some of the funds were allegedly used to pay individual kickback payments of $5,000 to $30,000 to Proposed Class Defendants for each individual who invested in the Jay Peak Projects. The alleged kickback payments were memorialized in agreements (the "Kickback Agreements") between the Jay Peak Projects and each Proposed Class Defendant. Proposed Class Plaintiffs do not allege any agreements between and among the Proposed Class Defendants regarding the Kickback

6

Agreements. Proposed Class Plaintiffs were not aware of the Kickback Agreements at the time they retained Proposed Class Defendants to provide legal services. "In general," Proposed Class Defendants "agreed that they would be paid money by Jay Peak after, and only after, one of their client's money was released from escrow to the Jay Peak Projects." *Id.* at 38, ¶ 52. Proposed Class Plaintiffs' funds were held in an escrow account to be released only after their initial I-526 Petition was approved, however, "upon information and belief, this escrow arrangement was not always followed[.]" *Id.* at 38, ¶ 53.

The Kickback Agreements allegedly formed the basis of a "Kickback Association or Enterprise" which was "an ongoing organization that functioned as a continuing unit over the course of many years, and at least from 2007 to April of 2016" and allowed Proposed Class Defendants to profit from funds paid to them by the Kickback Association or Enterprise. *Id.* at 39, ¶ 59. Proposed Class Defendants "appear[] to have received" kickbacks totaling more than $4.6 million.[3] *Id.* at 41, ¶ 76. The TAC alleges that each time a Proposed Class Defendant received money from the Jay Peak Projects, this created a deficit in funding that needed to be rectified by further investment by a subsequent immigrant investor.

In 2012, each Proposed Class Defendant allegedly received a letter from Douglas Hulme, an immigration advisor to the Jay Peak Projects, explaining that the Jay Peak Projects had orchestrated a Ponzi-scheme. Proposed Class Defendants allegedly failed to disclose this information to their clients and "assisted the Jay Peak Projects in hiding the allegations and reporting of the Jay Peak Ponzi-scheme[.]" *Id.* at 43, ¶ 85.

---

[3] The TAC asserts that Attorney Shen received kickbacks totaling $1,255,000; Defendant Silver received kickbacks totaling $685,000; Defendant Dai received kickbacks totaling $210,000; Defendant Geng received kickbacks totaling $195,000; Defendant Huuan received kickbacks totaling $140,000; Defendant Geng & Zhang, PLLC received kickbacks totaling $95,000; Defendant Snyder received kickbacks totaling $90,000; Defendant Flores received kickbacks totaling $90,000; and Defendant Cheng received kickbacks totaling $80,000.

## III. Conclusions of Law and Analysis.

### A. Whether to Allow Plaintiffs' Amendments to the Factual Allegations in Part I of the TAC.

The Shen Defendants do not squarely oppose Plaintiffs' request to amend their factual allegations as set forth in Part I of the TAC. With regard to those revisions, Plaintiffs were granted leave to amend by the court. At least insofar as their new factual allegations are concerned, there is no challenge to the proposed amendments on the grounds of bad faith, undue delay, or futility. Plaintiffs' motion to amend to include these revised factual allegations in Part I of the TAC is therefore GRANTED. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

### B. Whether to Permit Plaintiffs' Third Motion to Amend Part II of their Complaint.

Pursuant to Fed. R. Civ. P. 15(a)(1), "[a] party may amend its pleading once as a matter of course within . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." If more than twenty-one days have elapsed, "a party may amend its pleading only with the opposing party's written consent or the court's leave[,]" but "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

"The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quoting *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)). In addition to a showing of prejudice or bad faith, leave to amend may also be denied if there is undue delay in seeking the amendment, or if the amendment is "futile[.]" *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). Both the court and the parties have a duty to ensure "the just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1.

In addition to their individual claims in Part I of the TAC which are not challenged by the Shen Defendants, in Part II of the TAC, Plaintiffs seek leave to assert class action "stand alone" and conspiracy RICO claims, as well as a civil conspiracy to violate a

8

criminal statute claim and an unjust enrichment claim. (Doc. 67 at 2-3.) The Shen
Defendants oppose leave to amend on the grounds of futility and undue delay. They
assert that Plaintiffs lack standing for their class action claims, that "discovery is nearly
complete" (Doc. 74 at 3), and that if Plaintiffs' new claims are permitted to proceed on a
class action basis, "discovery will need to be significantly broadened and extended, all of
which will add to delays in this action, and impose additional costs on Defendants." *Id.*
The Shen Defendants further contend Plaintiffs' "hybrid civil/class action" is "highly
prejudicial" because it seeks "to combine . . . two separate and distinct actions into one
action" and "has been and continues to be extremely confusing such that even the
Plaintiffs[] have not been able to keep it all straight." *Id.* at 4-5.

In general, "the longer the period of an unexplained delay, the less will be required
of the nonmoving party in terms of a showing of prejudice[,]" *Block v. First Blood
Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (internal quotation marks omitted), but "[m]ere
delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a
district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654
F.2d 843, 856 (2d Cir. 1981). Prejudice to the opposing party nonetheless remains
"among the 'most important' reasons to deny leave to amend." *AEP Energy*, 626 F.3d at
725 (quoting *Fluor*, 654 F.2d at 856); *see also Evans v. Syracuse City Sch. Dist.*, 704
F.2d 44, 46 (2d Cir. 1983) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (holding
ability to amend is limited when there is "undue prejudice to the opposing party").

> A litigant may be "prejudiced" within the meaning of the rule if the new
> claim would: "(i) require the opponent to expend significant additional
> resources to conduct discovery and prepare for trial; (ii) significantly delay
> the resolution of the dispute; or (iii) prevent the plaintiff from bringing a
> timely action in another jurisdiction."

*Pasternack*, 863 F.3d at 174 (quoting *Block*, 988 F.2d at 350).

In this case, although Plaintiffs' pleading practices have created unnecessary
confusion and consumed considerable party and judicial resources, the Shen Defendants
have been aware of the essence of Plaintiffs' claims for some time. To a large extent,
Plaintiffs' factual allegations have remained the same and have simply been repackaged

9

with new legal theories. This case is not yet set for trial and discovery is ongoing. Against this backdrop, the delay has not been so extreme or prejudicial that leave to amend should be denied on the grounds of prejudice or undue delay. Leave to amend, however, is properly denied where a claim is futile. *See Cimino v. Glaze*, 228 F.R.D. 169, 171 (W.D.N.Y. 2005) ("A court may deny leave to amend . . . where the amended pleading is considered futile."). The Shen Defendants as well as the Silver Defendants assert that Plaintiffs' revisions to Part II of the TAC fail to state a claim and the court lacks subject matter jurisdiction.

## 1. Whether Part II of the TAC Fails to State a Claim.

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)). To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a proposed amendment is thus evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017); *see also Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of fact, credibility, and the weight of the evidence are not properly considered on a motion to

10

dismiss[.]"). Instead, it determines whether Plaintiffs have "nudged their claims across the line from conceivable to plausible[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

### a.    Conspiracy to Violate 13 V.S.A. § 1108.

Count III of the TAC alleges a conspiracy to violate 13 V.S.A. § 1108, a criminal statute regulating the receipt of kickbacks by private corporations which states as follows:

> (a) An officer or agent of, or person employed by a private corporation or business entity, who, being authorized to procure material, supplies, or other articles by purchase or contract, or to employ service or labor, shall not, directly or indirectly, solicit, ask, demand, exact, seek, accept, receive, or agree to receive, with intent that he or she will be influenced adversely to the interest of the employer or principal, any benefit from a person who makes such contract, furnishes such material, supplies, or other articles, or from a person who renders service or labor under such contract, nor shall a person give or offer such benefit.

> (b) A person who violates this section shall, if the value of the benefit is less than $500.00, be imprisoned not more than two years or fined not more than $5,000.00, or both. A person who violates this section shall, if the value of the benefit is $500.00 or more, be imprisoned not more than five years or fined not more than $10,000.00, or both.

13 V.S.A. § 1108.

In order to establish a claim for civil conspiracy under Vermont law, a plaintiff "must be damaged by something done in furtherance of the agreement, and the thing done [must] be something unlawful in itself[.]" *Akerley v. N. Country Stone, Inc.*, 620 F. Supp. 2d 591, 600 (D. Vt. 2009) (internal quotation marks omitted) (quoting *Boutwell v. Marr*, 42 A. 607, 609 (Vt. 1899)). In a non-precedential Order, a three-judge panel of the Vermont Supreme Court appeared to question the continued vitality of a common law cause of action for civil conspiracy. *See Davis v. Vile*, 2003 WL 25746021, at *3 (Vt. Mar. 1, 2003) (unpub. mem.) (dismissing for failure to state a claim and in doing so, "[a]ssuming that there continues to be an independent cause of action for the tort of civil conspiracy").

Where applicable state substantive law is unclear, a federal court sitting in diversity must predict how the state's highest court would decide the case. *See Giuffre*

11

*Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014) ("[I]t is our job to predict how the forum state's highest court would decide the issues before us[.]") (internal quotation marks omitted). The court thus predicts that, in certain circumstances, a civil conspiracy claim may be recognized under Vermont law which provides that "[a]ll who aid in the commission of a tort by another, or who approve of it after it is done, *if done for their benefit*, are liable in the same manner as they would be if they had done it with their own hands." *Montgomery v. Devoid*, 2006 VT 127, ¶ 22, 181 Vt. 154, 164, 915 A.2d 270, 278 (quoting *Dansro v. Scribner*, 187 A. 803, 804 (Vt. 1936)). The Vermont Supreme Court has frequently looked to the Second Restatement of Torts in defining the elements of a claim. *See, e.g., Glassford v. Dufresne & Assocs., P.C.*, 2015 VT 77, ¶ 12, 199 Vt. 422, 430, 124 A.3d 822, 827 (adopting the Second Restatement of Torts in defining claims of negligent misrepresentation); *Birchwood Land Co. v. Krizan*, 2015 VT 37, ¶ 9, 198 Vt. 420, 425, 115 A.3d 1009, 1012 ("We frequently have adopted provisions of this Restatement where our law is undeveloped.").

The Second Restatement of Torts describes tort liability for persons acting in concert as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. . . . Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.

Restatement (Second) of Torts § 876 (1979).

Even if a civil conspiracy claim is cognizable under Vermont law, however, Plaintiffs' conspiracy claim based on a violation of 13 V.S.A. § 1108 must be dismissed. A private plaintiff generally cannot assert a claim based on a violation of a criminal statute. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1551 (2016) ("Generally, only the

12

government ha[s] the authority to vindicate a harm borne by the public at large, such as the violation of the criminal laws.") (Thomas, J., concurring); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *AKC ex rel. Carroll v. Lawton Indep. Sch. Dist. No. 8*, 9 F. Supp. 3d 1240, 1245 (W.D. Okla. 2014) ("[A] civil conspiracy claim cannot be based on a violation of [a criminal] statute."); *Martensen v. Koch*, 2014 WL 3057172, at *7 (D. Colo. July 7, 2014) (holding that a civil conspiracy claim may not be based upon the violation of criminal statutes that "do not provide for private civil causes of action").

As applied to this case, there is no evidence that the Vermont Legislature intended to create a private cause of action for § 1108's enforcement. Leave to amend to add Count III of Part II is therefore DENIED as futile and Count III of Part II of the TAC is hereby DISMISSED.

### b. Unjust Enrichment.

Plaintiffs' unjust enrichment claims fail for a different reason. In Count IV of both Part I and Part II of the TAC, Plaintiffs assert claims for unjust enrichment under Vermont law, alleging that:

> Shen accepted and retained consideration from Plaintiffs Wang and Feng for legal services not performed.
>
> As a consequence of Shen's wrongful acts and conduct, Wang and Xiong have suffered, and continue to suffer, harm and damages, and Shen has been, and continues to be, unjustly enriched.

(Doc. 67-1 at 21, ¶¶ 106-07.)

In Part II, Plaintiffs propose to assert an unjust enrichment claim on a class action basis as follows:

> The Attorney Defendants accepted and retained consideration from their Plaintiff-clients for legal services that were not performed or not performed according to the reasonable expectations of their Plaintiff-clients.
>
> As a consequence of Defendants' wrongful acts and conduct, Plaintiffs are entitled to the forfeiture of any property and consideration acquired by Defendants through the purported performance of Defendants' legal

13

services, including the legal fees paid to Defendants, and the disgorgement of the illegal Kickbacks taken by Defendants.

*Id.* at 60-61, ¶¶ 141-42.

To state a claim for unjust enrichment under Vermont law, a plaintiff must allege: "(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Center v. Mad River Corp.*, 561 A.2d 90, 93 (Vt. 1989). Unjust enrichment is a quasi-contractual theory of liability, by which the law "implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable." *Brookside Mem'ls, Inc. v. Barre City*, 702 A.2d 47, 49 (Vt. 1997).

Where, as in the instant case, an unjust enrichment claim is based upon a contract between a client and his or her attorney, it fails to state a claim for which relief may be granted. This is because the contract provides a remedy at law which forecloses the availability of equitable relief. *See, e.g., City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir. 1988) (dismissing a quasi-contractual cause of action because "an express contract cover[ed] the subject matter"); *Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, 2016 WL 7176586, at *17 (D. Vt. Dec. 7, 2016) (recognizing that "[i]n the event [p]laintiff's adequate recovery at law is established, [p]laintiff's equitable claims will be dismissed"); *Dreves v. Hudson Grp. (HG) Retail, LLC*, 2013 WL 2634429, at *12 (D. Vt. June 12, 2013) ("The existence of a valid, express contract generally precludes quasi-contractual relief."); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) ("The existence of a valid contract will generally preclude quasi-contract claims.") (internal quotation marks omitted). As the Vermont Supreme Court has observed, "it can hardly be equitable to impose a contract on the parties that completely undermines the contractual relationships that the parties themselves have created." *DJ Painting, Inc. v. Baraw Enters., Inc.*, 776 A.2d 413, 419 (Vt. 2001).

14

As presently pled, Counts IV of Part I and II of the TAC fail to state a claim upon which relief may be granted because those counts assert an unjust enrichment claim based upon a contractual relationship.[4] Leave to amend to include an unjust enrichment claim is DENIED and Counts IV in Part I and II of the TAC are DISMISSED.

## 2. Whether Plaintiffs Have Standing for Their Remaining Proposed Class Action Claims.

A complaint may proceed as a proposed class action without the court first determining whether to grant class action certification under Fed. R. Civ. P. 23. *See Presser v. Key Food Stores Co-op., Inc.*, 218 F.R.D. 53, 57 (E.D.N.Y. 2003) ("Where . . . the defendant's opposition to [an] amendment involves not-yet-certified classes, allowing [an] amendment is appropriate and defendant's arguments against certification are more appropriately addressed in the context of motions to certify the proposed classes.") (citation and internal quotation marks omitted). A class action claim cannot proceed, however, if the court lacks subject matter jurisdiction over it.

The Shen Defendants assert that the TAC is deficient for the same reasons as Plaintiffs' previous Complaints because Proposed Class Plaintiffs lack Article III standing to sue Proposed Class Defendants. The Silver Defendants additionally argue that the claims against them must be dismissed for lack of subject matter jurisdiction because if this case does not proceed as a class action, there is no diversity of citizenship. The Silver Defendants concede that complete diversity is not always required for a class action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). In the event that diversity jurisdiction is found under CAFA, they seek dismissal for lack of personal jurisdiction.

Under Article III of the United States Constitution, the jurisdiction of federal courts is limited to the resolution of "[c]ases" and "[c]ontroversies[.]" U.S. Const. art. III, § 2. "A case is properly dismissed for lack of subject matter jurisdiction under Rule

---

[4] Although the Shen Defendants do not affirmatively seek dismissal of Part I of the TAC, they oppose the amendments generally as futile. Because Count IV of Parts I and II allege similar facts to support claims of unjust enrichment, the court has addressed both claims here.

15

12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* To invoke the jurisdiction of the federal courts, a plaintiff "must clearly . . . allege facts demonstrating each element" of Article III standing. *Spokeo, Inc.*, 136 S. Ct. at 1547 (internal quotation marks omitted).

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . (b) actual or imminent, not conjectural or hypothetical[.] Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted).

In the class action context, "with respect to each asserted claim against each defendant, a plaintiff must always have suffered a distinct and palpable injury to herself." *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 94 (2d Cir. 2018) (citation and internal quotation marks omitted). In other words, "representative plaintiffs must have individual standing to assert claims against all the members of a defendant class." *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 74 (S.D.N.Y. 1986); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (holding "no class may be certified that contains members lacking Article III standing").

The Second Circuit has observed that "a plaintiff's injury resulting from the conduct of one defendant [does not necessarily] have any bearing on her Article III standing to sue other defendants, even if they engaged in similar conduct that injured other parties." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65 (2d Cir. 2012); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) (holding that "a plaintiff must demonstrate standing for each claim he seeks to press"). "Nor does a plaintiff who has

16

been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).

Plaintiffs' claims in Part II include alleged violations of RICO on a class action basis. RICO makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c).

"A plaintiff's burden is high when pleading RICO allegations as [c]ourts look with particular scrutiny at claims for a civil RICO, given RICO's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies." *Mackin v. Auberger*, 59 F. Supp. 3d 528, 541 (W.D.N.Y. 2014) (internal quotation marks omitted).

> To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute[.] In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden— *i.e.*, invoking RICO's civil remedies of treble damages, attorney[']s fees and costs. To satisfy this latter burden, plaintiff must allege that he was "injured in his business or property *by reason of* a violation of section 1962."

*Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citations omitted).

In support of Counts I and II of Part II of the TAC, Plaintiffs allege predicate acts including "entering into the [Kickback] Agreements with Jay Peak, for the diversion of investor money to the Defendant Attorneys, upon the occurrence of a client investing their money into the Ponzi-scheme." (Doc. 67-1 at 52, ¶ 104.) Plaintiffs allege that these acts constitute a "scheme or artifice to defraud . . . another of the intangible right of

17

honest services" under 18 U.S.C. § 1346. *Id.* at 52, ¶ 105 (internal quotation marks omitted).

Although Plaintiffs arguably allege RICO claims against their own respective attorneys and the alleged "Kickback Association or Enterprise,"[5] there is no plausible allegation that the Proposed Class Defendants had agreements amongst themselves to assist or participate in the criminal enterprise. To the contrary, the TAC alleges that the Proposed Class Defendants acted only in concert with the Jay Peak Projects and the Kickback Association or Enterprise, not with each other. For example, in Count I, the TAC alleges:

> Defendant Attorneys are persons within the meaning of 18 U.S.C. § 1961(3) because they and their law firms were "capable of holding a legal or beneficial interest in property." *They conducted the affairs of the enterprise with the Jay Peak Projects* through a pattern of racketeering in violation of 18 U.S.C. § 1962(c). *The Defendant Attorneys participated in the overall enterprise's affairs* through a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), consisting of numerous and repeated uses of the mails, interstate wire communications, and bank transfers to execute a scheme to defraud in violation of 18 U.S.C. § 1962(c).
>
> The "Kickback Association" or "Kickback Enterprise" described herein was an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendant Attorneys, including their employees and agents; (ii) the Jay Peak Projects, including their principals, employees, and agents; (iii) unnamed conspirators who were aware of and assisted in delivering and procuring the Agreements with Defendant Attorneys, and who assisted in concealing the Kickback Agreements from potential investors in the Jay Peak Projects. The Kickback Association -- drawn together and memorialized in the Kickback Agreements consisting of payments in exchange for investor clients -- was an ongoing organization that functioned as a continuing unit over the course of many years, and at least from 2007 to April of 2016. *The Defendant Attorneys worked in conjunction with and in agreement with Jay Peak Projects* over the course of those years, exploiting the structure of the association as a whole, and its

---

[5] "The honest-services statute, § 1346, defines the term scheme or artifice to defraud . . . to include a scheme or artifice to deprive another of the intangible right of honest services." *Skilling v. United States*, 561 U.S. 358, 369 (2010) (internal quotation marks omitted). The statute prohibits "fraudulent schemes to deprive another of honest services through bribes or kickbacks[.]" *Id.* at 404.

18

would-be legitimate operations as an EB-5 project, in order to commit the offenses described herein and to conceal the underlying Kickback Agreement that assured lucrative money for the Defendant Attorneys and continuation of the Ponzi-scheme. While the pattern of racketeering activity was not the only activity of the Kickback Associations as a whole, the Defendant Attorneys were able to commit the offenses solely by virtue of their position within the Kickback Association. The Kickback Association was created and used as a tool to effectuate Defendant[s'] pattern of racketeering activity. The Class Defendant "persons" are distinct from the Kickback Enterprise.

The Kickback Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated for the common purpose of diverting client funds from the investment pool, and misappropriating of these funds for the illicit purpose of paying the Defendant Attorneys in exchange for a client subscribing to and committing their money to the Jay Peak Ponzi-scheme.

Every time the Agreements were executed it created a predicate act that ultimately constituted racketeering activity (again, the "Racketeering Activity["]). *The Racketeering Activity described herein consists of continuous predicate acts in entering into the Agreements with Jay Peak, for the diversion of investor money to the Defendant Attorneys,* upon the occurrence of a client investing their money into the Ponzi-scheme. The Racketeering Activity also includes the receipt of the money each time that a client put their money into the Jay Peak Ponzi-scheme. In each case, the predicate acts are entering the Kickback Agreements and receipt of the Kickback itself.

For the purposes of this cause of action, the predicate acts consist of violations under 18 U.S.C. §§ 1341, 1542, and 1346, which prohibit the use of the mails and interstate wires to implement a "scheme or artifice to defraud [by depriving] another of the intangible right of honest services." 18 U.S.C. § 1346.

The Defendant Attorneys used and exploited their positions, and their attorney-client relationships, for illicit personal gain in breach of their duties owed to clients. The Defendant Attorneys derived undisclosed profits from business transacted with their clients, in deprivation of the client's rights to honest services in violation of 18 U.S.C. § 1341. In every agreed upon transaction for money in exchange for a client, the Defendant Attorneys used the interstate mails and wire communications in furtherance of a scheme to misuse the attorney-client relationship for gain at the expense of the client's right to attorney services.

*Id.* at 134-137, ¶¶ 101-06 (emphasis supplied).

In Count II, Plaintiffs allege a conspiracy to violate RICO, in relevant part as

follows:

*Defendant Attorneys entered into individual and ongoing Agreements with the Jay Peak Projects*; each Defendant Attorney entered into more than two of these Agreements in a ten-year time period; and each Defendant Attorney received more than two payments (within a ten-year period) under these Agreements in exchange for their client's commitment of their investment into the Jay Peak Ponzi scheme. The Kickback Agreements themselves created an agreement and conspiracy to violate 18 U.S.C. §§ 1341, 1542, and 1346.

*The Defendant Attorneys have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.* The Defendant Attorneys knew that their predicate acts were part of a pattern of Racketeering Activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

Each of the Plaintiff-clients was damaged by the scheme to deprive them of honest services, because each one of them was deprived of honest services. The damage was the direct and proximate cause of the wrongful conduct, because depriving them of these services in order to be illegitimately compensated from the investor[s'] pool of funds was the direct object of the conspiracy and agreement to undertake the wrongful conduct.

The Defendant Attorneys did not just breach a fiduciary duty, the Defendant Attorneys exploited their position as lawyers, and exploited their clients and their client[s'] investment funds, to illicitly benefit themselves in an undisclosed transaction.

*Id.* at 141-42, ¶¶ 122-25 (emphasis supplied).

"In order to bring suit under § 1964(c), a plaintiff must plead (1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001). For both Plaintiffs' "stand alone" and conspiracy RICO claims, each Proposed Class Plaintiff must allege an injury he or she suffered which is fairly traceable to each Proposed Class Defendant. *See Lujan*, 504 U.S. at 560-61 (ruling that to establish an "injury in fact" a plaintiff must plausibly allege he or she suffered "an invasion of a legally protected interest which is (a) concrete and

20

particularized, . . . (b) actual or imminent, not conjectural or hypothetical, . . . and fairly . . . trace[able] to the challenged action of the defendant") (citations and internal quotation marks omitted).

In Counts I and II of Part II of the TAC, the Proposed Class Plaintiffs stumble when they seek to allege claims against a Proposed Class of Defendants who include individuals with whom they have had no contact. They do not plausibly allege they suffered an injury caused by attorneys they neither retained nor relied upon. For example, although Plaintiff Wang alleges that he suffered an injury caused by the Shen Defendants' acceptance of alleged kickbacks from the Jay Peak Projects or the Kickback Enterprise, he does not and cannot plausibly allege he suffered this same or a similar injury as a result of the acts or omissions of the Silver Defendants who did not represent him in his EB-5 visa application and investment activities. Nor can Plaintiff Wang allege that attorneys who did not represent him, such as the Silver Defendants, owed him a duty of care. Any injury Plaintiff Wang suffered as a result of the alleged RICO enterprise was thus caused by his *own* attorney's agreements, acts, or omissions and not by the agreements, acts, or omissions of attorneys with whom he had no interaction or relationship. Because Plaintiff Wang could not bring a RICO claim individually against an attorney with whom he had no interaction or relationship, he cannot do so as a class action plaintiff. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 481-82 (S.D.N.Y. 2014) (holding that "named plaintiffs lack standing to sue each of the named defendants 'in their own right' under Article III" because "[t]o the extent that any named plaintiff experienced an injury, it may be fairly traced to the defendant that allegedly breached the contract and was then unjustly enriched, not to the [entity] with which plaintiff maintained no relationship").

Casting a claim as a conspiracy to violate RICO does not materially alter the analysis. *See Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 407-08 (5th Cir. 2003) (ruling that in class actions a RICO plaintiff can only assert his or her own injuries to satisfy standing); *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 659 (3d Cir. 1998), *abrogation on other grounds recognized by Forbes v. Eagleson*, 228 F.3d 471 (3d

Cir. 2000) ("To link their own injuries to the alleged RICO enterprise, plaintiffs must allege what happened to them. . . . Until the putative class is certified, the action is one between [the named plaintiffs] and the defendants"). Nor is standing plausibly alleged by conclusory allegations that the Proposed Class Defendants "conspired," coupled with the elements of a RICO violation unsupported by facts supporting an agreement between the Defendants. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"); *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973) (finding that named plaintiffs could not bring a class action against defendants that did not injure them, "even though the plaintiff may have suffered an identical injury at the hands of a party other than the defendant").

In essence, Proposed Class Plaintiffs seek to allege a "'rimless wheel' conspiracy [which] is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002). In *Kotteakos v. United States*, 328 U.S. 750, 755 (1946), the Supreme Court "made clear that a rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants." *Dickson*, 309 F.3d at 203 (citing *Kotteakos*, 328 U.S. at 768-69 and Joseph F. McSorley, *A Portable Guide to Federal Conspiracy Law* 145 (1996) ("While the hub may view its dealings with the spokes as part of a single agreement, a spoke may be concerned simply with his or her own actions.")). Although some courts have been willing to allow such a claim to proceed in the context of a Sherman Act violation, Plaintiffs cite no authority for relaxing the standing requirement for alleging a conspiracy to violate RICO, especially prior to the certification of a class. *See Denney*, 443 F.3d at 263-64 (ruling that the "filing of suit as a class action does not relax [the] jurisdictional requirement [and] no class may be certified that contains members lacking Article III standing"); *Tomassini v. FCA US LLC*, 326 F.R.D. 375, 384 (N.D.N.Y. 2018) (observing that "the language in *Denney* is clear

enough: a proposed class must be defined in such a way that anyone within it would have standing") (internal quotation marks omitted).

Because Proposed Class Plaintiffs' claims set forth in Counts I and II of Part II of the TAC lack standing to proceed on a class action basis against Proposed Class Defendants with whom they had no relationship, leave to amend for those claims is DENIED and Counts I and II of Part II of the TAC are DISMISSED.

## C. Whether the Court Lacks Personal Jurisdiction or Subject Matter Jurisdiction over the Silver Defendants.

Because the court has dismissed Part II of the TAC which contains only class action claims, the court need not consider whether those same claims should be dismissed against the Silver Defendants for lack of diversity jurisdiction or personal jurisdiction. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587-88 (1999) (observing that addressing subject matter jurisdiction at the outset of a case will often be most efficient as it will negate a personal jurisdiction challenge). In order to obviate this issue, the court nonetheless agrees that without class action claims, it would not have jurisdiction over state law claims asserted by Plaintiff Stephen Webster against the Silver Defendants because they are all residents of California. *See* 28 U.S.C. § 1332 (requiring complete diversity of citizenship between plaintiffs and defendants in addition to the requisite amount in controversy).

With regard to personal jurisdiction, Plaintiffs assert that "because jurisdiction is proper as to [the Shen Defendants], jurisdiction in this RICO suit is proper as to all co-defendants arising out of the same operative facts." (Doc. 109 at 7.) Although 18 U.S.C. § 1965(b) provides for nationwide service of process in certain circumstances, it "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998). Instead, a plaintiff must establish personal jurisdiction over one defendant and demonstrate that the "ends of justice" require exercising jurisdiction over the remaining defendants. *Id.* The court declines to engage

23

in an ends of justice analysis at this time in light of its determination that Plaintiffs' class actions claims against Proposed Class Defendants are futile and must be dismissed.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Plaintiffs' third motion to amend their Complaint (Doc. 67) and GRANTS the Silver Defendants' motions to dismiss (Docs. 86 & 87) on the grounds set forth herein.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __ day of July, 2019.

Christina Reiss, District Judge
United States District Court